Paul D. HANSON and Michael Dunbar,
Trustee of the Estate of Paul D.
Hanson in Bankruptcy, Plaintiffs,

v.

Richard P. MINETTE, Individually and
Richard P. Minette as Trustee of Paul
D. Hanson Trust, Defendants.

Paul D. HANSON and Michael Dunbar,
Trustee of the Estate of Paul D.
Hanson in Bankruptcy, Appellants,

v.

BANKERS TRUST
COMPANY, Appellee.

No. 89–873.

Supreme Court of Iowa.

Oct. 17, 1990.

David L. Phipps and Jaki K. Samuelson of Whitfield, Musgrave & Eddy, Des Moines, for appellants.

Brent B. Green and S.P. DeVolder of Gamble, Riepe, Webster, Davis & Green, Des Moines, for Bankers Trust Co., appellee.

Considered by McGIVERIN, C.J., and LARSON, SCHULTZ, SNELL, and ANDREASEN, JJ.

ANDREASEN, Justice.

In March 1984 Paul D. Hanson (Hanson) and the Paul D. Hanson Trust brought an equitable action against Bankers Trust Company (Bankers Trust) as trustee. The petition, as amended, asked for an accounting, the award of damages for breach of fiduciary duties, breach of contract, negligence, and other equitable relief. In the summer of 1984 Hanson terminated the trust and received the remaining assets of the trust. Hanson filed bankruptcy in May of 1985. Before trial, the action against Bankers Trust was consolidated with a lawsuit brought by the same plaintiffs against Richard P. Minette, co-trustee and Hanson's attorney and attorney-in-fact. During the trial the Paul D. Hanson Trust was dismissed as a plaintiff and the trustee in bankruptcy was added as a party plaintiff.

Following trial, the court in May 1989 filed its findings of fact, conclusions of law, judgment and decree. The court dismissed the petition against Bankers Trust. It also entered judgment against Minette for $468,888 with interest, payable to the trustee in bankruptcy. Hanson and the trustee in bankruptcy appeal from the dismissal of their claims against Bankers Trust. Bankers Trust cross-appealed. No appeal was taken by Minette. We affirm the district court's judgment and decree.

I. *Standard of Review.*

This case was tried in equity. Therefore, our review is de novo. Iowa R.App.P. 4. Although we are not bound by the trial court's factual findings, we give weight to them, particularly with regard to the credibility of witnesses. Iowa R.App.P. 14(f)(7); *Russell v. Johnston,* 327 N.W.2d 226, 228 (Iowa 1982).

II. *Background Facts.*

Paul D. Hanson, forty-two years old at the time of trial, is the youngest son of John K. Hanson, the founder and chairman of the board of Winnebago Industries, Inc. (Winnebago). In 1972 Hanson owned 842,120 shares of Winnebago common stock with a cost basis for tax purposes of about fifteen cents a share. Historically, Winnebago stock did not pay cash dividends. In that year Hanson established the "Paul D. Hanson Trust Dated July 12, 1972." The corpus of the trust consisted of his Winnebago stock, having a value at that time of $36–40 million. In this trust Hanson served as the trustee, and income and principal were distributable upon his direction. The trust was revocable, and upon Hanson's death the corpus descended to nieces, nephews and a family foundation. Northern Trust Company of Chicago, Illinois (Northern Trust) was named as a succesor trustee. The trust instrument was prepared for Hanson by the corporate and family attorneys in Chicago. The purpose of the trust was to avoid probate.

On July 12, 1972, Hanson also formalized with Northern Trust the "Paul D. Hanson Discretionary Investment Account" which had been established earlier in 1972. This account was funded with one million dollars in cash which Hanson received as a gift from his father in 1972, minus $200,000 spent to pay off existing debts. Its purpose was to provide Hanson with funds to make "liberal investments." Within a few years this discretionary account was depleted. About one-half of the account had been lost through poor investments, and the rest had been distributed to and spent by Hanson.

After leaving the employ of Winnebago in 1970, Hanson held no job until returning to Winnebago in 1984; during this time he consistently stated his occupation as "in-

vestor." He lived for most of the year in Florida, although he maintained a residence in Clear Lake, Iowa, where he spent summers and holidays. In 1977 Hanson bought a forty-seven-foot yacht, the *Swan Song*, using a $215,000 loan from Northern Trust. Hanson began racing the *Swan Song* and soon became deeply involved in competitive offshore sailboat racing.

In the late 1960's Hanson had developed a strong friendship with Richard Minette. In 1974, soon after Minette graduated from law school, Hanson executed a full power of attorney in favor of Minette. While initially Minette merely collected Hanson's mail and paid his bills, Hanson came to rely more heavily on Minette in both financial and personal matters. Hanson was not totally dependent on Minette, however; he still retained ultimate control of his affairs.

In 1977 Hanson began selling shares of Winnebago from the trust. The value of the stock had declined from $36–40 million to about three and one-half million dollars due to economic conditions. In 1978 Hanson decided to amend his trust. He was dissatisfied with Northern Trust, and he wanted to refinance three bank loans. He owed $188,000 to Northern Trust, $145,000 to Manufacturer's Bank of Forest City, and $40,000 to Commerce State Bank in Clear Lake. After meeting with Minette and Hanson, Bankers Trust agreed to serve as co-trustee with Minette under the amended trust. They also agreed to loan money to Hanson to enable him to discharge the three outstanding bank loans.

To amend the 1972 trust, Minette took the original document and edited it to reflect the changes Hanson wanted. Hanson did not consult another attorney. The finished draft was largely a substitution for the 1972 trust provisions; however, it was not a new trust. Much of the language used was identical to the 1972 version and, in fact, the title remained "Paul D. Hanson Trust Dated July 12, 1972." The corpus of the trust at the time of the amendment consisted of 792,240 shares of Winnebago common stock, a condominium in Clear Lake, Iowa, and negligible stock holdings in three other corporations.

Bankers Trust proposed four changes to the draft of the amended trust which were accepted by Hanson. The first change was a clause making the trust irrevocable until Hanson's thirty-fifth birthday, then about three years off. This provided security for the loan which Bankers Trust made to Hanson. The second change was a clause which provided: "... the trustees may elect to pay the debts incurred by the beneficiary." The third change required Bankers Trust, as corporate trustee, to keep possession of the trust assets. The final change was language that permitted the trustees to sell Winnebago stock at their discretion. We, like the district court, find that under the circumstances it was reasonable for Bankers Trust to request these changes before agreeing to serve as trustee.

Although Hanson and Minette had estimated Hanson's expenses to be around $7000 per month, they were actually far greater. Bankers Trust was forced to sell Winnebago stock to pay the debts Hanson was incurring. Typically Hanson overdrew his Clear Lake checking account, and Minette would then advise Bankers Trust that funds were needed. Bankers Trust would then sell Winnebago stock and deposit the proceeds in Hanson's account.

In February of 1983 Hanson discovered the phone in his Florida apartment had been disconnected because the bills had not been paid; the trust assets had been depleted. Hanson flew back to Iowa, discharged Minette as his attorney-in-fact, and eventually brought this action.

### III. *Purpose of the Trust.*

The purpose of a trust governs its administration and enforcement. *Anderson v. Telsrow*, 237 Iowa 568, 575, 21 N.W.2d 781, 785 (1946). The purpose is determined by examining the language of the trust instrument and the surrounding circumstances. *First Nat'l Bank of Dubuque v. Mackey*, 338 N.W.2d 361, 363 (Iowa 1983).

In setting out the trustee's distribution powers, the Hanson trust provides:

It is my desire without making it mandatory that each power to make discretionary payment of income or principal shall be exercised by the trustees subject to the following guides: (1) such power shall be exercised liberally for the beneficiary, without regard to more remote interests, to provide for the health, comfortable support, education ... and welfare of the beneficiary, ... taking into account the beneficiary's customary standard of living and station in life....

Given this very liberal language, it seems clear that the trust was not intended as a means of limiting Hanson's spending. He intended to maintain his "customary standard of living," and that involved spending a great deal of money.

It would appear from the evidence that the trust as amended in 1978 had several purposes. One was to provide new management for the trust assets. Another purpose of the trust not expressed therein, but clear from the surrounding circumstances, was to secure refinancing for Hanson's loans. In addition Hanson expressed a desire to secure a corporate trustee in Iowa which would provide investment and accounting services. Hanson intended the trust would continue to provide for his extravagant lifestyle.

Diversification of the trust assets was not an express purpose of the amended trust, although it was discussed. The trust instrument expressly authorized the trustees to retain Winnebago stock. The trust did not place any personal restrictions on Hanson, or give the trustees any control over his person.

Hanson conceded that the purpose of the trust was not to defraud his creditors. While the trust contains spendthrift-type language, it is universally held that a settlor may not create a spendthrift trust in favor of himself. 76 Am.Jur.2d *Trusts* § 168 (1975), 89 C.J.S. *Trusts* § 26 (1955); *Restatement (Second) of Trusts* § 156 (1957); A. Scott, W. Fratcher, II A *Scott on Trusts* § 156 (4th ed. 1987); *Harrison v. City Nat'l Bank of Clinton, Iowa*, 210 F.Supp. 362, 370 (S.D.Iowa 1962).

Hanson contends that while this language is ineffective to create a spendthrift trust, it does evince an intent to protect Hanson from his own poor spending and investment habits. This purpose is at odds, however, with the extremely liberal distribution language and with the clause that immediately follows the pseudo-spendthrift language: "[h]owever, the Trustee may elect to pay the debts incurred by the beneficiary." Thus any intent to restrain Hanson's spending was outweighed by his intent to continue with his previous lifestyle.

IV. *Breach of Fiduciary Duty.*

Hanson claims that Bankers Trust breached its fiduciary duty by making excessive disbursements, by failing properly to manage and invest the trust assets, and by engaging in self-dealing. We address each in turn.

A. Excessive Disbursements.

Between 1978 and 1982 all of Winnebago stock was sold. The trustees disbursed funds to Hanson or for his benefit in the sum of $2,469,658. Over one million dollars of this sum was disbursed to the Community State Bank of Clear Lake, Iowa, for deposit to Hanson's personal checking account.

As noted, the trust contained extremely broad language regarding disbursements. By using such language as "comfortable support," "without regard to more remote interests," and "customary standard of living and station in life," and by stating that the distribution power was to be "exercised liberally for the beneficiary," the trust instrument makes it clear that Hanson did not want to restrict the availability of his assets.

While Hanson now insists his intent in creating the trust was to remove his ability to control the expenditure and investment of his assets, that is not what the trust instrument says. While the trust instrument easily could have specifically limited the amount to be expended on Hanson's behalf each year, Hanson instead chose extremely broad language to insure the continuation of his previous lifestyle. His

"customary standard of living" consisted of wanton spending and risky investments. It is by denying Hanson those luxuries that the trustees would have breached their duty. We find that the expenditure of over $460,000 for the forty-seven-foot racing sailboat, the *Seier*, which Hanson purchased in 1981 was consistent with his previous lifestyle and standard of living. Similarly, the quarter of a million dollars Hanson lost by investing in a fledgling seafood importing business was consistent with his prior history of making speculative investments, a practice which Hanson had no intent of giving up when he amended the trust.

In short, the reason the trustees made such extensive disbursements is that Hanson was incurring extensive debts. Hanson concedes that he intended for his creditors to be paid. He also concedes that he received regular accountings from Bankers Trust showing what was left in the trust, although he rarely bothered to read them. Moreover, the trust instrument contained a clause specifically authorizing the trustees to "elect to pay the debts incurred by the beneficiary." The trustees could not restrain Hanson in his spending nor could they justifiably refuse to pay his debts once incurred.

■ The spendthrift-like language in the trust would be ineffective as against Hanson's creditors. Section 156(2) of the *Restatement (Second) of Trusts* states: "where a person creates for his own benefit a ... discretionary trust, his ... creditors can reach the maximum amount which the trustee under the terms of the trust could pay to him or apply for his benefit." *See also Farmers State Bank v. Janish*, 410 N.W.2d 188 (S.D.1987). Hanson was the sole beneficiary of the trust during his life. Both the corpus and its income were distributable to him "without regard to more remote interests." Thus, the corpus of the trust was subject to garnishment had the trustees failed to pay Hanson's creditors. *See id.;* 76 Am.Jur.2d *Trusts* § 168 at 404–05 (1975).

■ Even if the liberal disbursements were a breach of the trustees' duties, Han-son would be estopped to hold them liable. In *Chirurg v. Ames*, 138 Iowa 697, 116 N.W. 865 (1908), under somewhat similar circumstances we stated "... where the *cestui* is of full age, and induces the very conduct of which he complains, is satisfied with the methods adopted while they are progressing, interferes himself with the duties of the trustee, and keeps part of the accounts himself, no such strictness is required as in the ordinary case." *Id.* at 707, 116 N.W. at 868. If a trust beneficiary consents to an act of the trustee prior to or during the commission of the act, he cannot hold the trustee liable for it. *Restatement (Second) of Trusts* § 216(1); *In re Poulsen's Estate*, 54 Wis.2d 139, 194 N.W.2d 593 (1972). Because Hanson incurred substantial debt, knowing that trust assets would have to be sold to pay those debts, he effectively consented to the sale of stock and distribution by the trustees of the proceeds to pay those debts. Minette who was authorized as Hanson's attorney-in-fact to "do generally all things necessary to conduct any business or private matters whatsoever on [Hanson's] behalf," authorized the sales of stock. Hanson is estopped to complain of the disbursements.

## B. Mismanagement.

■ Hanson claims that Bankers Trust breached its fiduciary duty by failing to diversify the trust assets. Ordinarily, trustees in Iowa are held to the standard imposed by the Model Prudent Person Investment Act. Iowa Code §§ 633.123, 682.-60 (1989). However, the settlor can vary the terms of trust management from those set out by statute. *See* Iowa Code § 633.699; *In re Lawson's Will*, 215 Iowa 752, 759, 244 N.W. 739, 742 (1932); 76 Am.Jur.2d, *Trusts* § 277 (1979); *In re Jones' Will*, 221 Minn. 524, 22 N.W.2d 633, 634 (1946). There were several such provisions in the Hanson trust.

One such clause provided the trustees could "invest and reinvest trust assets in any kind of property ... which the trustee shall deem proper ... without being restricted to investments as fixed by the laws

of any jurisdiction." Another clause permitted the trustees:

> To continue trust assets invested in any property received or acquired by the Trustees without obligation to sell all or any part thereof because not of a type or quality or constituting a diversification considered proper or wise for trust investments....

A third relevant clause stated "the Trustees are specifically authorized to sell as they deem advisable in their sole discretion Winnebago Industries stock." Hanson now contends that because one clause authorizes the trustees to retain Winnebago stock and another authorizes them to sell it, the instrument is ambiguous on this point and should therefore be resolved in his favor. We disagree. Both clauses are permissive; they merely expand the trustee's options. They are not inconsistent and create no ambiguity.

It is conceded by Bankers Trust that the trust assets were never diversified. It urges, however, and the district court agreed, that the trustees' failure to diversify was not a breach of their duties under the circumstances.

When Bankers Trust assumed its duties as trustee in 1978 there was concern about selling the Winnebago stock due to S.E.C. rule 144 and Hanson's familial ties to the corporation. By the time those concerns had been cleared up, the value of the Winnebago stock had begun to decline. Because of the depressed value of the stock, combined with the fact that much of the income realized by the sale would result in large capital gains due to the extremely low basis in the stock, the trustees decided to sell no more stock than was necessary to pay the debts being incurred by Hanson until the stock went back up. The stock did eventually go back up; unfortunately, by that time the trust assets were exhausted.

In *Matter of the Estate of Wiese*, 257 N.W.2d 1 (Iowa 1977), the trustee was directed by the will to convert stocks and debentures into cash within a reasonable amount of time after the testator-settlor's death. Because of a depressed market the trustee delayed sale of the stock until it was finally forced to sell the stock at a price even lower than it had been originally. Applying the Model Prudent Person Investment Act, we held the trustee had not breached its duty. Under *Wiese*, the facts of the present case would suggest a similar result. The language in the trust instrument specifically authorizing the trustees to retain the Winnebago stock makes that conclusion unavoidable.

### C. Self–Dealing.

■ Hanson claims that the trustees engaged in impermissible self-dealing by selling Winnebago stock to pay off the loan Bankers Trust made to Hanson at the inception of the 1978 amendment. This loan was one of the primary reasons for amending the trust. The trust instrument expressly permitted the trustees to pay off Hanson's debts, and Hanson authorized the loan and its repayment. Under such circumstances there is no impermissible self-dealing. *See Harvey v. Leonard*, 268 N.W.2d 504, 512–13 (Iowa 1978), and cases cited.

### V. *Exculpatory Clause.*

■ The trust instrument, both prior to and following the 1978 amendment, contains the following exculpatory clause: "No Trustee shall ever be liable for any act or default of any other Trustee nor for any loss sustained through any error of judgment but shall only be liable for such Trustee's own willful default."

The *Restatement (Second) of Trusts* section 222 states: "(1) except as stated in subsections (2) and (3), the trustee, by provisions in the terms of the trust, can be relieved of liability for breach of trust." Subsection (3) states:

> To the extent to which a provision relieving the trustee of liability for breaches of trust is inserted in the trust instrument as the result of an abuse by the trustee of a fiduciary or confidential relationship to the settlor, such provision is ineffective.

Comment d lists factors to be considered in determining whether there was an abuse of

a fiduciary relationship. Hanson claims the exculpatory clause in this case should be inapplicable because it was inserted by the trustees as a self-serving form of protection. In light of the factors listed in comment d to section 222 of the *Restatement*, it is clear that Bankers Trust did not abuse any fiduciary or confidential relationship with Hanson. Prior to Hanson's signing of the 1978 amendment, there was no fiduciary relationship between Hanson and Bankers Trust; all dealings were at arm's length.

There is no reason why the exculpatory clause should not be valid. Furthermore, we find that Bankers Trust committed no willful breach of trust. Thus, even if Bankers Trust had negligently breached its duty, it would not be liable due to the exculpatory clause.

## VI. *Cross–Appeal.*

Because we affirm the trial court's dismissal of the petition, we need not consider the cross-appeal from rulings on matters raised by Bankers Trust in their defense.

AFFIRMED.