**IN THE COURT OF APPEALS OF IOWA**

No. 13-1170
Filed July 16, 2014

**IN THE MATTER OF THE ESTATE OF
OWEETIS FRYE, Deceased.**

**ROBERT D. FRYE, BENJAMIN D. FRYE,
and HANNA M. FRYE,**
        Beneficiaries-Appellants.

_____

        Appeal from the Iowa District Court for Buchanan County, Andrea J. Dryer, Judge.

        Three beneficiaries of the Estate of Oweetis Frye appeal from an order sustaining in part and denying in part their objections to the executor's final report. **AFFIRMED.**

        Danita L. Grant and Douglas M. Henry of Fuerste, Carew, Juergens & Sudmeier, P.C., Dubuque, for appellants.

        Dana L. Oxley and Richard S. Fry of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for executor BankIowa appellee.

        Heard by Danilson, C.J., and Potterfield and McDonald, JJ.

**DANILSON, C.J.**

Three beneficiaries of the Estate of Oweetis Frye appeal from an order sustaining in part and denying in part their objections to the executor's final report. On appeal, the objectors first contend the district court erred in concluding BankIowa did not breach the fiduciary duties it owed to Oweetis Frye or damage her interests in her deceased husband's testamentary trust. They also assert the court erred in finding BankIowa's maintenance of the status quo after Oweetis's stroke was not a breach of fiduciary duties, in failing to surcharge BankIowa for mismanagement of the trust and of Oweetis's agency account, in failing to assess punitive damages against BankIowa, and in failing to award attorney fees to the objectors.

**I. Background Facts and Proceedings.**

Wilbert and Oweetis Frye were married in 1941 and had two children, Richard and Robert. Wilbert and Oweetis owned farmland near Independence in Buchanan County, Iowa, and over the years acquired a total of about 600 acres. They lived in a farmhouse on the acreage they farmed.

In 1975, Wilbert and Oweetis formed a family corporation, Pilot Grove Farm, Inc. and deeded 280 acres of the farmland they owned to the corporation. Wilbert first managed Pilot Grove Farm on his own, but in 1980, Wilbert and Oweetis's son Richard took over management. Pilot Grove Farm grew crops and raised livestock on the 280 acres of its farmland. Wilbert and Oweetis continued to own the remaining 320 acres of farmland, which included their homestead, as tenants in common.

At least since December 1980, Pilot Grove Farm rented the remaining 320 acres of farmland still owned by Wilbert and Oweetis. Pilot Grove Farm grew crops on the tillable acres it rented and grazed its cattle on the pastureland. Between 1980 and 1988, Pilot Grove Farm gave promissory notes to Wilbert and Oweetis in lieu of cash rent. The notes were made payable to Wilbert or Oweetis, and all but one (given in December 1980) was due on demand. The amount of the promissory notes varied over the years, as did the interest rate stated. Wilbert and Oweetis collected some of the principal and interest on the notes. Three of the promissory notes given by Pilot Grove Farm (for 1982, 1983, and 1989 rent) were paid off completely.

On December 2, 1986, Wilbert and Oweetis executed "mirror wills," that is, wills with identical terms. According to the 1986 wills, Wilbert and Oweetis intended Richard and Robert each to receive a portion of the family farmland, with Richard getting all of the shares of Pilot Grove Farm and forty more acres than Robert.

Wilbert Frye died on February 1, 1989. Wilbert's will created a residuary trust (Trust), which was funded by the residue of Wilbert's estate[1]—his interest in the promissory notes given by Pilot Grove Farm, one-half interest in the 280 acres of farmland not owned by Pilot Grove Farm, one-half interest in a forty-acre homestead, and his stock in Pilot Grove Farm.[2] From the time of Wilbert's death

---

[1] Oweetis also received specific bequests.

[2] When the corporation was first created, Wilbert owned approximately seventy percent of the Pilot Grove shares, Richard owned about thirty percent of the shares, and Oweetis and Richard's wife, Lucretia, each owned one share. Over the years, Wilbert gifted some of his stock to Oweetis, Richard, and Robert. Robert sold his shares back to the corporation in 1989.

until November 2005, Oweetis owned 1979 of 5567 shares of Pilot Grove Farm, Richard owned 2047, Richard's wife Lucretia owned one, and the Trust owned 1540.

The net income of the Trust was to be paid to Oweetis during her lifetime. "In addition to the net income, my corporate trustee shall pay to my wife such sums from the principal as my corporate trustee deems advisable for her health, education, support and maintenance." On Oweetis's death, the Trust was to terminate, and any remaining assets distributed to Robert and Richard as specified.

BankIowa[3] was appointed as executor and trustee; Oweetis was granted the right to serve as co-executor and co-trustee, which she did. In Article XIV, the trustee was granted "all powers necessary" to administer the trust, including in paragraph 6,

> To continue any farming operation which may be acquired by the trust, to operate any farm with hired labor, tenants, or share croppers and to employ agents; to lease any farm for cash or a share of the crops; to acquire farm machinery, equipment, and livestock; to construct and improve buildings; to make or obtain loans at the prevailing rate of interest; to employ conservation practices; to manage any timber; in general, to perform such acts as my trustee deems appropriate using such methods as are commonly employed by other farm owners in the community in which the farm property is located.

Following Wilbert's death, Roger Johnson (a trust officer of BankIowa) had a written lease drafted with regard to farmland owned jointly by Oweetis and the Trust. Thus, after Wilbert's death, Oweetis was both landlord and tenant under leases with Pilot Grove Farm. As landlord, Oweetis and the Trust jointly owned

---

[3] Farmers State Savings Bank, BankIowa's predecessor in interest, was actually named as executor and trustee of the Trust. We refer only to BankIowa for ease of reference.

the 280 acres of farmland leased to Pilot Grove Farm. Oweetis and the Trust also jointly owned a majority of the shares of Pilot Grove Farm, the tenant of the property. Although Oweetis and Wilbert had not collected the cash lease payments from Pilot Grove Farm for several years prior to Wilbert's death, BankIowa as trustee began collecting the cash payments and paying them to Oweetis—the sole income beneficiary of the Trust. The rent collected from Pilot Grove Farm was paid half to Oweetis outright and half to Oweetis as the income beneficiary of the Trust.

Oweetis remained active in the farming operation, management of the Trust assets, and making her own financial decisions from the time of Wilbert's death in February 1989 until 1995. For example, in May 1992, Richard sought an option to purchase the 280 acres that was to go to Robert under Wilbert's and Oweetis's wills—Oweetis refused. She purchased Robert's shares in Pilot Grove.[4] Oweetis participated in determining what rent would be charged for the farmland leased to Pilot Grove Farm, which remained at an amount below market value.[5] She determined no demand would be made on the promissory notes owed by Pilot Grove Farm. Oweetis also served as an officer of Pilot Grove Farm.

---

[4] Her attorney, Donald Hoeger, testified she purchased Robert's shares "so he got a fair price for that stock."

[5] Trust officer Johnson testified as follows:

> Q. Okay. And did she tell you why she didn't want to make any changes in the rent? A. She wanted the corporation to—to be successful, and she knew how hard it was to make money in farming because she had been active in the farm operation in her younger years. And so she—she didn't need more money, and therefore didn't want to raise the rent.
>
> Q. All right. She didn't want to raise the rent. Of course she owned half the farm. A. Yes.

On April 20, 1992, Oweetis designated BankIowa her general power-of-attorney.

In November 29, 1993, Oweetis executed a new will. Under the new will, the beneficiaries of Oweetis's estate were Robert and his children, Benjamin Frye and Hanna Frye, and Richard and his children, Rick Frye, Scott Frye, and Jeff Frye. Robert was devised certain real estate (about 280 acres, Article III) and a $65,000 specific bequest (Article VII). Richard was devised certain real estate (about 320 acres, Article IV), her stock in Pilot Grove Farm (Article V), and any interest she had in promissory notes owed by Pilot Grove Farm (Article VIII). The residue of Oweetis's estate was left in equal one-fifth shares to grandchildren Benjamin, Hanna, Rick, Scott, and Jeff. The Fryes' long-time attorney, Donald Hoeger, opined Oweetis gave the specific bequest to Robert "[b]ecause she was going to give all of the notes from the corporation to Richard, and this was . . . her idea of trying to be fair." But Oweetis's primary intent was to give "280 acres to [Robert] and the corporate stock to Richard."

On April 5, 1994, BankIowa opened an agency account where Trust income,[6] the rent owed to Oweetis personally, and her other sources of income from investments and social security were deposited.

Oweetis had a stroke on May 4, 1995, which left her unable to speak. On May 23, 1995, in consultation with Hoeger, BankIowa determined it was

---

[6] In their amended objections to the final report, the objectors contended, "No income was distributed to Oweetis out of the trust during the years 1990-1994. BankIowa asserts that '[i]f no distributions were made to Oweetis Frye, it is because Oweetis Frye chose not to receive those distributions. In any event, there were subsequent excess income and principal distributions to Oweetis Frye from the Trust, so there was no adverse overall effect by a failure to distribute income to Oweetis Frye in the early years of the Trust.'" BankIowa admitted these statements and denied mismanagement.

appropriate to activate the power of attorney Oweetis had executed. Thereafter, BankIowa negotiated leases with and collected rent from Pilot Grove Farm, managed Oweetis's financial affairs, and paid Oweetis's bills. Oweetis, who had been admitted to a nursing home after her stroke, never returned to her home. Her house was eventually occupied by one of Richard's grown children. No rent was charged.

Oweetis Frye died on February 19, 2007.

**A. William Frye Trust—Objections to Final Report of Trustee and Application to Remove Trustee.**

BankIowa, as trustee of Wilbert's Trust, filed its final report in October 2007. Robert and his two children, Benjamin and Hanna, filed objections to the Trust report, claiming the trustee failed to maximize Trust income, which could diminish Robert's specific bequest and his children's residuary interest under Oweetis's will. They requested BankIowa be removed as trustee. The district court concluded Robert, Benjamin, and Hanna Frye lacked standing, a ruling we affirmed on appeal. *See In re Trusteeship Under the Will of Wilbert Frye*, No. 08-0775, 2009 WL 250355 (Iowa Ct. App. Feb. 4, 2009). We stated:

> Upon our review of the record, we conclude the district court correctly applied the law with regard to objectors Benjamin and Hanna. A trustee owes a duty of loyalty to the trust and to its beneficiaries and must act in good faith in all actions affecting the trust. Oweetis was the sole income beneficiary under the trust. Robert was a remainder beneficiary. Benjamin and Hanna, however, are not interested persons or beneficiaries of Wilbert's trust, as they were not entitled to *any* property or interest under the trust. As a result, Benjamin and Hanna have no standing to allege BankIowa breached its fiduciary duty. We therefore determine Benjamin and Hanna's claims were properly dismissed. With regard to Robert, we disagree with the district court in its determination that he is not an interested party. Under the Iowa

Trust Code's broad definition of interested persons, we find that Robert is an interested party as a remainder beneficiary of Wilbert's residuary trust.

We do not find, however, that Robert has standing to invoke judicial intervention in this case. Standing requires a party to show (1) a specific, personal, and legal interest in the litigation and (2) an injury. Although we have found that Robert (as an interested person) has a specific, personal, and legal interest in the litigation, he must also show that he has been injured. Robert was not entitled to receive income from rental payments collected by real estate owned by Oweetis and the trust. Furthermore, Robert was not entitled to any Pilot Grove Farm, Inc. stock under the trust. We do not find that Robert was injured by BankIowa's actions. His injury, if any, is in his mother's estate.

*Id.*, 2009 WL 250355, at *3-4 (citations and footnotes omitted).

**B. Oweetis Frye Will—Petition to Remove Executor.**

As noted above, Oweetis's will named as beneficiaries her sons, Robert and Richard,[7] and her five grandchildren. BankIowa was appointed as executor on February 23, 2007. Robert, Benjamin, and Hanna filed a petition to remove BankIowa as executor on May 29, 2008, alleging BankIowa breached its fiduciary duties and mismanaged Oweetis's estate. BankIowa filed a response on June 24, 2008, and on June 25 filed its "Executor's Final Report and Application for Discharge." The other beneficiaries joined in BankIowa's response to the petition for removal. The district court dismissed the petition to remove the executor.

On appeal, this court ruled:

The final report was filed June 25, 2008, almost two and a half years ago. Since that time, the parties have engaged in extensive and sometimes contentious discovery. BankIowa asserts the estate does not have the assets to pay the cost of a new executor and new attorney because, at the beneficiaries' request, all assets of the estate have been distributed, except for a small

---

[7] Richard died before Oweetis.

amount of cash which is not enough to pay ordinary fees, let alone additional fees. Petitioners have not denied these assertions. The administration of the estate is virtually complete. Disposition of the final report has been on hold for two and a half years. At this late stage in the proceedings it makes little sense or benefit, economic or otherwise, to remove BankIowa as executor and appoint another, particularly when avenues for relief remain open to the petitioners concerning their claims of mismanagement on the part of BankIowa. The petitioners present no compelling argument to the contrary.

Presented with unusual circumstances, the district court made a pragmatic decision in granting BankIowa's motion for summary judgment dismissing the petition to remove. Not having reached the merits of the controversy, the petitioners are still free to litigate their claims. We find no abuse of discretion on the part of the district court in granting BankIowa's cross-motion for summary judgment . . . .

*In re Estate of Oweetis Frye*, No. 10-0778, 2011 WL 238424, at *4 (Iowa Ct. App. Jan. 20, 2011). The matter of the objections to the executor's final report remained before the district court.

### C. Oweetis Frye Will—Objections to Executor's Final Report.

Robert, Benjamin, and Hanna (whom we will refer to now as objectors) filed amended objections to BankIowa's final report as executor of Oweetis Frye's estate. Boiled down to their essences, the objectors contended (1) Oweetis's agent (BankIowa) failed to charge fair market value rent on property Oweetis owned, failed to collect rent on her homestead, failed to collect interest from promissory notes, failed to charge rent on pasture land, and paid unnecessary expenses, all of which diminished Oweetis's estate; (2) the trustee of Wilbert's Trust (BankIowa) failed to maximize the income from the Trust (in the same ways Oweetis's agent failed to maximize her income) to which Oweetis was entitled, which diminished Oweetis's estate; and (3) the executor of Oweetis's estate (BankIowa) failed to sue Oweetis's agent and the trustee of

Wilbert's testamentary trust, thereby breaching the executor's fiduciary duties and diminishing Oweetis's estate.[8]

At the hearing on the objections to the final report, the objectors' expert witness, Leland Anderson, testified BankIowa as trustee breached its fiduciary duties in charging under market-value rent, not collecting rent for pasture land, not collecting rent for the year 2000, and in paying for application of lime on non-Trust property; and as Oweetis's agent trustee breached its fiduciary duties in not collecting on the promissory notes, not collecting rent on her house, and in paying for lime application on Trust property. Anderson testified BankIowa did not make the Trust as productive as "it should be."

> Q. If the bank had administered the trust [and] Oweetis'[s] agency properly, would they have been able to maintain the $166,000 in liquid assets [she had at the time of her stroke]? . . . . A. As far as—it would seem to me . . . now I'll preface that, that if income was generated at market level on the farm, if interest was collected on the notes, if interest—rent was collected on pasture rent, and if the house rent was collected, there possibly could be enough to take care of that.

Anderson testified on cross-examination that he had been a trustee of a trust that included family farmland and the farmland had been rented to a relative of the income beneficiary, and in turn, the relative had rented the land to someone else "probably" at a higher rate.

---

[8] Another objection embedded in the objectors' brief is the contention that BankIowa was guilty of self-dealing in violation of Iowa Code section 633.160 (2007). This contention was related to BankIowa's loans to Pilot Grove Farm while at the same time serving as trustee and not maximizing the rent charged to Pilot Grove Farm. Although this objection was identified among the initial objections raised, it was not encompassed in the objectors' first amended and substituted objections. Furthermore, the issue was not addressed by the district court and therefore was not preserved. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

After the hearing on the objections, the district court ruled that BankIowa—as agent—breached its duty to Oweetis in failing to charge Pilot Grove Farm cash rent of $12,125 for the year 2000.  Because the executor had not made the claim against the agent, the court wrote:

> The balance remaining [in the estate] when the first amendment to the final report was filed was $21,229.49.  Attorney fees of $9022.67 remain to be paid ($25,044.03 allowed, less prior payments of $3499.35; $4144.65; and $8377.36).  Additional court costs may need to be paid.  Although the final report indicates that the funds remaining after the payment of the attorney fee balance will be paid to BankIowa for the balance of its executor fees, the court finds that the estate funds remaining after payment of any unpaid court costs and the attorney fees of $9022.67 should be paid to Robert Frye and that no additional executor fees should be paid to BankIowa.  BankIowa has already been paid $21,671.89 of the $36,344.68 allowed to it by the court's January 2, 2008 order.  Its $14,672.79 fee balance shall not be paid due to its breach of fiduciary duty in failing to collect the $12,125 rent payment due to Oweetis.

Without specifically addressing any other objections, the court overruled the objectors' objections concluding that BankIowa did not breach any other fiduciary duties nor was indebted to Oweetis's estate.

## II. Scope and Standards of Review.

A hearing on the objections to the final report is in equity and our review therefore is de novo.  Iowa R. App. P. 6.907; *In re Estate of Johnson*, 387 N.W.2d 329, 332 (Iowa 1986); *Estate of Randeris v. Randeris*, 523 N.W.2d 600, 604 (Iowa Ct. App. 1994); *see also* Iowa Code § 633.33 (2007).  We give weight to the trial court's fact findings, especially when considering the credibility of witnesses, but are not bound by them.  Iowa R. App. P. 6.904(3)(g).

**III. Analysis.**

"The issues presented by a hearing on a final report involve the correctness of the executor's accounting and those questions necessarily involved in the accounting. The inquiry can be broad, but is usually confined to the conduct of the executor in his or her fiduciary capacity." *Randeris*, 523 N.W.2d at 604. While an executor has the burden of supporting the items contained in the final report, *see* Iowa Code § 633.477, an objector to the final report carries the burden of establishing the objection. *In re Estate of Carson*, 289 N.W. 30, 37 (1939) ("The objectors have the burden of sustaining their affirmative allegations."); *accord In re Estate of Wiese*, 257 N.W.2d 1, 7 (Iowa 1977) ("The burden to show wrongful conduct which suffices to surcharge a fiduciary is upon those so asserting.").

The liability of a fiduciary is set forth in section 633.160, which contains the following language:

> Every fiduciary shall be liable and chargeable in the fiduciary's accounts for neglect or unreasonable delay in collecting the credits or other assets of the estate or in selling, mortgaging or leasing the property of the estate; for neglect in paying over money or delivering property of the estate the fiduciary shall have in the fiduciary's hands; for failure to account for or to close the estate within the time provided by this Code; for any loss to the estate arising from the fiduciary's embezzlement or commingling of the assets of the estate with other property; for loss to the estate through self-dealing; for any loss to the estate arising from wrongful acts or omissions of any cofiduciaries which the fiduciary could have prevented by the exercise of ordinary care; and for any other negligent or willful act or nonfeasance in the fiduciary's administration of the estate by which loss to the estate arises.

Iowa Code § 633.160. At issue here are claims falling under the last provision of section 633.160 holding a fiduciary liable "for any other negligent or willful act or

nonfeasance in the fiduciary's administration of the estate by which loss to the estate arises." *See*, *e.g.*, *Haney v. Kitchen*, 690 N.W.2d 675, 677 (Iowa 2005).

An executor stands in the shoes of the decedent. *See Ames Trust & Sav. Bank v. Reichardt*, 121 N.W.2d 200, 204 (Iowa 1963); *Sexton v. C.L. Percival Co.*, 177 N.W. 83, 89 (Iowa 1920) ("[P]laintiff, who, as administrator, stands in the shoes of decedent, is entitled to a certificate of the 15 shares which should have been issued to decedent, and the court should have so found and entered a decree accordingly."). To the extent that Oweetis could have challenged the trustee's actions, BankIowa as executor could challenge the trustee's actions related to administration of the Trust,[9] or the actions of Oweetis's agent.[10]

Oddly, neither party has addressed the order filed July 13, 2010, terminating the trust administration. The order states, in part:

> The issues concerning the trust have all been resolved, and therefore, the Court enters the following order.
> IT IS ORDERED that the Trustee shall distribute the remaining funds out of the trust consistent with the Federal and State taxes filed with the appropriate agencies. No objections have been filed concerning attorney's fees, the Trustee shall also distribute funds from the trust to reconcile the attorney fee applications.

---

[9] *Cf.* Iowa Code §§ 633.351 (providing the personal representative of estate is to take possession of real and personal property of decedent, except exempt property), .366 ("The naming of any person as executor in a will shall not operate as a discharge or bequest of any right of action owned by the testator against such persons, if it is a right that otherwise survives against such person. Every such right of action shall be included among the assets of the decedent in the inventory."

[10] This claim comes to us by way of objections to the executor's final report. *See In re Estate of Carson*, 289 N.W. 30, 36 (1939) ("The American Trust Company acted as trustee since the first report of the executor and also acted as executor. The final report of the American Trust Company is its report as executor and trustee and, as stated, the objectors accused the executor and trustee of maladministration. In the trial below they may seek to prove a breach of fiduciary duty by the American Trust Company in its capacity as executor, trustee, or executor, acting as trustee, and should not be required to make an election at this time in which capacity it will seek to prove that the trust company was guilty of a dereliction of duty.").

IT IS FURTHER ORDERED that the Court's jurisdiction over the trust is hereby terminated.

However, because BankIowa has not contended the objections are barred by the order and the order does not discharge the trustee, we will proceed to determine the merits of the objections as if still viable.

"[T]he trustee shall administer the trust according to the terms of the trust and according to this trust code, except to the extent the terms of the trust provide otherwise." Iowa Code § 633A.4201. A trustee is required to administer a trust "solely in the interest of the beneficiaries." *Id.* Section 633A.4203 provides, "A trustee shall administer the trust with the reasonable care, skill, and caution as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust."

"The purpose of a trust governs its administration and enforcement." *Hanson v. Minette*, 461 N.W.2d 592, 594 (Iowa 1990). "The purpose is determined by examining the language of the trust instrument and the surrounding circumstances." *Id.* "The goal is to ascertain the settlor's intent. It is determined, if possible, from the language of the trust instrument, the scheme of distribution, and the facts and circumstances surrounding the execution." *First Nat'l Bank of Dubuque v. Mackey*, 338 N.W.2d 361, 363 (Iowa 1983).

Wilbert's will provided, in relevant part:

If my wife, Oweetis Frye, survives me, I bequeath the residue of my estate, which shall be called the "RESIDUARY TRUST", to the trustee hereinafter named, to be administered as follows:

A. During the life of my wife:
1. My trustee shall pay the net income to my wife in convenient installments.

2. In addition to the net income, my corporate trustee shall pay to my wife such sums from the principal as my corporate trustee deems advisable for her health, education, support, and maintenance.

B. At the death of my wife:
1. My trustee shall pay over and distribute the entire remaining assets as follows:
a. If any part of the following described property is a part of my trust assets at the time of final distribution . . . I give, devise and bequeath said real estate to my son, Robert Frye.
b. If any part of the following described property is a part of my trust assets at the time of final distribution . . . I give, devise and bequeath said real estate to my son, Richard Frye.
c. If any shares of Pilot Grove Farm, Inc. are a part of my trust assets at the time of final distribution, I give, devise and bequeath said shares to my son, Richard Frye.
d. All the rest, residue and remainder of the trust assets then remaining are to be paid as follows:
One half (1/2) to my son, Robert Frye; and
One half (1/2) to my son, Richard Frye.

The language of the Trust indicates its purpose was to provide for Oweetis during her lifetime and pass on the farmland to his sons. Oweetis was entitled to the net income of the Trust, and any principal the trustee "deems advisable for her health, education, support, and maintenance." The objectors argue the trustee breached its fiduciary duties owed to Oweetis by (1) failing to make the Trust productive of reasonable income, and (2) failing to generate sufficient income to meet Oweetis's needs. In response, BankIowa argues the objectors seek to impose a requirement that the trustee maximize the income from the trust property, an obligation that is not imposed by the trust language or by the surrounding circumstances. BankIowa asserts profit maximization is not the only consideration. Rather, when a trust's assets include a family farm operation,

proper management of those trust assets requires consideration of a variety of factors.

One acting under a power of attorney is a fiduciary required to act in the principal's best interests. *In re Estate of Crabtree*, 550 N.W.2d 168, 171 (Iowa 1996).

***A. Did the district Court err in concluding BankIowa did not breach the fiduciary duties it owed to Oweetis Frye or damage her interests in the Trust?***

Here, the objectors have the burden to establish BankIowa as executor had a claim against the trustee of Wilbert's Trust or against the agent and acted unreasonably in not pursuing that claim. *See Carson*, 289 N.W. at 37. If there was no claim to pursue, the executor did not act unreasonably. We agree with BankIowa that the evidence at the hearing indicated Wilbert's intent and purpose for establishing the Trust was to provide for Oweetis's care should Wilbert predecease her, preserve the family farming operation, and ultimately pass the farmland on to their two sons.

The objectors acknowledge,

> Prior to her disabling stroke, when she was fully competent to act as a Co-Trustee, Oweetis, in her capacity as the sole income beneficiary, may have consented to the breach of the duty of the corporate trustee, the Bank, to make the Trust, and the farmland, in particular, productive of income. As the sole income beneficiary, Oweetis could have elected to receive less than fair market rent for the farmland.

*See* Iowa Code § 633A.4506(1)(a), (c) ("A beneficiary shall not hold a trustee liable . . . if the beneficiary . . . [c]onsents to [or affirms] the conduct . . . ."); *Hanson*, 461 N.W.2d at 596 ("If a trust beneficiary consents to an act of the

trustee prior to or during the commission of the act, he cannot hold the trustee liable for it."). However, the objectors argue that after Oweetis's stroke the trustee should have charged fair market value rent on Trust property, collected interest from promissory notes, and charged rent on Trust-owned pasture land and the house in which Oweetis no longer lived.

In its appellate brief, BankIowa contends that the objectors' assertion that after Oweetis's stroke BankIowa was required to drastically change its management of the Trust assets ignores the varying, and sometimes inconsistent, interests BankIowa had a duty to consider—"the intent of the settlor and of the income beneficiary does not go out the window just because the income beneficiary's circumstances change." BankIowa maintains that after Oweetis's stroke, it continued to follow the Trust's purpose, Wilbert's intent, and Oweetis's clearly demonstrated wishes to preserve the family farming operation while also considering Oweetis's increased care needs. It notes that it twice increased rent on the farmland to help pay her increased living expenses during the twelve years Oweetis spent at the care facility.

The district court found:

> Oweetis's interest in the residuary trust created by Wilbert's will was for the trust to provide for her health, education, support, and maintenance while she lived. Oweetis's medical and care expenses were met. Sufficient funds were expended to maintain her home and ensure that it remained available to her during her lifetime, should she have been able to return home for any length of time with full-time nursing care or palliative care. There is no indication that Oweetis was not provided enough income from the trust to meet her needs or desires while she lived. BankIowa did not breach the fiduciary duty that it owed to Oweetis or damage her interests in the trust. BankIowa has established that it is not liable for any debt owed to Oweetis's estate for breaching its duties to

Oweetis as beneficiary of the residuary trust established by Wilbert's will.

From the time that Oweetis appointed BankIowa as her attorney-in-fact on April 20, 1992, until she suffered a severe stroke on May 4, 1995, there is no indication that Oweetis objected to how BankIowa managed her affairs. As her attorney Donald Hoeger noted, prior to her stroke, Oweetis was knowledgeable, competent, arid actively involved in the family farming business. For example, when Oweetis, her attorney, her accountant, and the co-trustee from BankIowa met with Richard Frye on May 1, 1992, Oweetis made it clear that 280 acres of the farmland was going to be given to Robert Frye—period—and that Richard would not be given the opportunity to purchase that land. Had Oweetis been opposed to BankIowa's actions as her attorney-in-fact from April 1992 until May 1995, she would have made her opposition known.

After May 4, 1995, BankIowa conducted Oweetis's affairs for the most part as they had been conducted before her stroke. The bank ensured that the expenses associated with the care and maintenance of her home and yard were paid and that her home was not abandoned or occupied by non-family members. BankIowa made no attempt to collect interest or principal on promissory notes that Pilot Grove Farm, Inc. had given to Wilbert or Oweetis because Oweetis did not want interest or principal to be collected. Oweetis made her intentions with respect to the promissory notes clear to her attorney Donald Hoeger and by the terms of her will, in which she gave all of the notes to Richard Frye, who was to receive the shares of Pilot Grove Farm, Inc. according to his parents' wills. Also, BankIowa continued to charge below-market-rate cash rent for land Oweetis rented to Pilot Grove Farm, Inc. as Oweetis had done prior to her stroke.

However, in one respect BankIowa did fail to manage Oweetis's affairs in the manner that a reasonable person knowing Oweetis's intentions would have carried out her business. Oweetis clearly expected Pilot Grove Farm, Inc. to pay cash rent annually for her farmland, albeit at lower than market rates. BankIowa failed to collect the $12,125 cash rent for Oweetis's land for 2000. In 2005, BankIowa decided to accept tiling improvements for which Richard Frye paid in lieu of pursuing collection of the $12,125, even though the tiling was done on Pilot Grove Farm, Inc. land rather than land that the corporation rented from Oweetis. This decision was a breach of BankIowa's fiduciary duty to Oweetis as her attorney-in-fact and caused her damages of $12,125.

With the one exception, in essence the district court found the executor

was reasonable in not pursuing claims against the trustee or the agent.

"A trustee shall administer the trust with the reasonable care, skill, and caution as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust." Iowa Code § 633A.4203; *see also Wiese*, 257 N.W.2d at 6 ("The standard of care generally applicable to executors is that degree of prudence and diligence which a person of ordinary judgment would be expected to bestow upon his own affairs of a like nature. However, with respect to assets coming into the hands of a fiduciary, there is an additional burden to act more cautiously than would be expected in the management of its own property. Furthermore, a bank normally engaged in a fiduciary capacity must exercise the skill and knowledge ordinarily possessed by such professionals." (citations omitted)). Considering the purposes, terms, distribution requirements, and other circumstances of the Trust, as well as Oweetis's consent and stated intent during her life time, and including her testamentary distribution plan, we find no reason to disturb the court's findings.

**B. Did the court err in finding BankIowa's maintenance of the status quo after Oweetis's stroke was not a breach of fiduciary duty?**

In a related issue, the objectors urge the district court's findings that after Oweetis's stroke BankIowa essentially maintained the status quo was "gross error." They argue that Oweetis's needs changed drastically after her stroke and thus,

> [i]n addition to obtaining market rent on the tillable acres, the Bank also should have obtained rent on the pastureland used by PGF and Dick for their cattle and rent on Oweetis' house after she was no longer able to live in it herself after her stroke. The Bank failed to do any of these things. Had the Bank done so, there would have been a considerable amount more income generated in the Trust.

We acknowledge the circumstances changed when Oweetis became a resident of the nursing home and ultimately became incompetent. However, we conclude BankIowa did not mismanage the trust assets for several reasons.

First, the evidence shows Oweetis had displayed the intent to charge below-market-value rent on the farmland prior to her stroke. And she and Wilbert had not charged rent on the pasture land. The trustee could reasonably continue those practices in light of the intent of Oweetis and Wilbert to leave the farmland to their sons. *See Goodwine v. Goodwine*, 819 N.E.2d 824, 829-30 (Ind. Ct. App. 2004) (rejecting a beneficiary's argument that the trustee must maximize profits where the trust instrument indicated a dual purposes of maintaining current productivity of the farm property—thereby providing income to present beneficiaries—and maintaining that productivity into the future—thereby preserving the land for the remainder beneficiaries). The terms of the trust did not require profit or income to be maximized. The use of the term "customary methods" related to farming methods, not generation of income or profit.

Second, and more significantly, the objectors' assertions cut both ways. The rent and the promissory note debt were owed by Pilot Grove Farm. Oweetis owned 35.5% of Pilot Grove Farm outright; the Trust owned 27.6% of Pilot Grove Farm and Oweetis was the Trust's sole income beneficiary. Thus, while Oweetis—as owner and income beneficiary—may have benefited from increased rent on the one hand, Oweetis—because of her interest in the tenant, Pilot Grove Farm—would also be responsible for paying a large portion of the rent, which jeopardized the viability of the corporation or its ability to pay the mortgage and thereby diminish her estate. We believe the record clearly indicates Oweetis

intended Richard to receive Pilot Grove Farm and would not have wanted to oust Pilot Grove Farm as the renter of the property. Roger Johnson testified:

> Q. And so was there any discussion about who would farm the land after Wilbert's death and the rent to be paid? A. It was assumed that Richard would continue farming. That was the family's hope, and I'm sure it was Richard's desire also.
> Q. Was that Oweetis'[s] desire? A. Yes.
> . . . .
> Q. Mr. Johnson, who decided how much the rent would be? A. Oweetis.
> Q. And the bank was co-trustee with her. What was the Bank's reaction? A. Well, she was very insistent on it. She wanted the farm corporation to succeed. She wanted the farm continuity. And she knew that if the rents were high, the viability of the farm operation as it was could be weakened. She wanted the rents low.

Third, the district court never concluded at what point in time Oweetis became incompetent. The date of when Oweetis became incompetent is significant because BankIowa is relieved of liability prior to her incompetency because she signed or made a mark on all annual trust accountings until 2003. The Trust terms provided in part:

> The trustee shall, at least annually, make an accounting to all beneficiaries, and the approval by a beneficiary, or his parent, legal guardian or conservator, shall release and relieve the trustee from any further responsibility or liability with respect to that beneficiary, and his or her heirs and assigns, for its actions during the period covered by the accounting.

Although she was unable to speak after her stroke, the evidence is disputed whether she could communicate in writing and remained competent for a short period of time. We can conclude that the district court necessarily determined that Oweetis was incompetent by the year 2000 because the court concluded there was merit to the objection that the Bank failed to collect rent for that year. Oweetis was both a co-trustee and beneficiary of the Trust. She signed the

annual report for the year 2000 by a mark and did not object to the annual report. Accordingly, at best, we can conclude the district court determined Oweetis was incompetent at the time she made her mark on the report for the year 2000. Thus, all objections that precede the year 2000 are no longer viable. We also add that Robert began receiving annual trust accountings, and approved the same, beginning in 2005—so he is unable to challenge any actions of the trustee thereafter.

Fourth, the differing duties of BankIowa must be considered. As trustee, BankIowa was a minority shareholder of the stock in Pilot Grove Farm. Upon exercising its authority as the power of attorney for Oweetis, it had authority over both the Trust's shares and Oweetis's shares, the total being a majority of the shares. Clearly, BankIowa had the duty to protect and preserve the viability of the corporation and its assets but its duties under the trust and power of attorney differed.

As agent, serving pursuant to Oweetis's power of attorney, BankIowa was limited by the principle that "a power of attorney must be strictly construed and the instrument will be held to grant only those powers which are specified." *Crabtree*, 550 N.W.2d at 170.

Although Oweetis's power of attorney authorized BankIowa to invest her assets, it also authorized the bank to "carry on my businesses or businesses." BankIowa had a fiduciary duty to act in Oweetis's best interests, further the principal's interests, and otherwise act for the benefit of the principal and avoid where possible acts detrimental to the principal. *See id.* at 171. However, the power of attorney did not impose upon the agent the duty to manage and invest

the property consistent with a trustee's obligations under Iowa Code sections 633A.4302 through .4309, or a conservator's obligations under Iowa Code section 633.641 (requiring a conservator to invest "prudently"). Put simply, Oweetis's power of attorney specified various powers but, in essence, BankIowa was "to manage and conduct [her] affairs." There was no term in Oweetis's power of attorney imposing an obligation to preserve her assets to assure the existence of sufficient monies to satisfy bequests in her will. Rather, Oweetis's interests were to be furthered, and her primary interest was to preserve the farm corporation and her farmland.

Fifth, the objectors' evidence that the trustee's actions damaged Oweetis's estate is tentative at best. While their expert stated BankIowa did not make the Trust as productive as "it should be," his testimony was that "*if* income was generated at market level on the farm, *if* interest was collected on the notes, *if* interest—rent was collected on pasture rent, and *if* the house rent was collected, there *possibly could be enough*" income generated to have maintained the assets Oweetis had at the time she suffered her stroke in 1995. Further, even if more income had been generated, it is speculative to assume more assets would have existed at the time of Oweetis's death. Any additional income could have been spent for repairs or maintenance on her interest in the farmland. Additionally, BankIowa as the corporate trustee also could have exercised its discretion to provide additional funds from the corpus to Oweetis for her health,

support, and maintenance.[11] As a result, any damages to the estate are speculative at best. *See Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 309 (Iowa 1998) (stating "overly speculative damages cannot be recovered").

We affirm the district court's findings, including the finding that BankIowa, breached its fiduciary duties only as agent for Oweetis by its acceptance of tiling improvements by Richard in lieu of pursuing collection of the $12,125 owed for rent in 2000. We conclude BankIowa did not otherwise violate its fiduciary duties in failing to generate more income. BankIowa faced differing obligations imposed upon itself first as a co-trustee of the Wilbert H. Frye Testamentary Trust; and subsequently as both the sole-acting trustee and Oweetis's agent via her power of attorney. Further, the Trust and Oweetis were both landlord and tenant relative to some of the corporately owned farmland and the percentages of ownership differed during the term of the Trust. BankIowa also had to consider the purposes of the Trust. Here, Oweetis was entitled to all of the net income of the Trust and the corpus of the Trust could be invaded as the "the corporate trustee deems advisable" for her "health, education, support and maintenance." These terms are consistent with a discretionary support trust. *See In re Barkema Trust*, 609 N.W.2d 50, 54-55 (Iowa 2004) (concluding a trust with terms that permit the trustee to invade the corpus as deemed necessary for a beneficiary's support and maintenance is a discretionary support trust).

---

[11] We acknowledge that Oweetis was a resident of a nursing home but we will not assume additional services, comforts, or medical care could not have been provided to her.

### *C. Did the court err in failing to surcharge BankIowa?*

In light of the breach found, the district court determined that BankIowa would receive no further compensation. This was appropriate under Iowa Code section 633.162 ("In fixing the fees of any fiduciary, the court shall take into consideration any violation of this probate code by the fiduciary, and may diminish the fee of such fiduciary to the extent the court may determine to be proper.").

The objectors contend, however, that the district court "only looked at and considered what money was left in the Estate when considering the amount of damages to impose against the Bank." They assert, "The District Court did not surcharge the Bank in its own personal accounts for its actions, even though it had the authority to do so."

Iowa Code section 633.157 provides:

> Every fiduciary shall be liable for, and chargeable in the fiduciary's accounts with, all of the estate that comes into the fiduciary's possession at any time, including all the income therefrom; but the fiduciary shall not be accountable for any debts due to the estate or other assets of the estate that remain uncollected without the fiduciary's fault. The fiduciary shall not be entitled to profit from the increase in value of any asset of the estate, nor shall the fiduciary be chargeable with loss resulting, without the fiduciary's fault, from the decrease in value or the destruction of any part of the estate, excepting, only to the extent of the fiduciary's pro rata share in such gain or loss as one of the distributees of the estate.

While the objectors also cite *Hamilton v. Mercantile Bank of Cedar Rapids*, 621 N.W.2d 401, 406 (Iowa 2001) ("The measure of damages for such breach of trust is the difference between the value of the beneficiary's rights to principal and income before and after the breach."), and Iowa Code sections 633A.4503

("A beneficiary may charge a trustee who commits a breach of trust with the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred, or, if greater, the amount of profit lost by reason of the breach."), and 633A.4502, (stating a beneficiary of the trust may request the court to "compel the trustee to redress a breach of trust by payment of money or otherwise," "reduce or deny compensation to the trustee," and "order any other appropriate relief"), those remedies are for a breach by a trustee. The breach found by the district court, which we affirm here, was a breach by BankIowa as Oweetis's agent. The trust code, chapter 633A, is not applicable. *See* Iowa Code § 633A.1107.

The amount of the remaining compensation sought by BankIowa exceeded the amount of the uncollected rent in 2000. We conclude the district court's resolution of this issue was reasonable and no further surcharge should be imposed upon the BankIowa.

### D. Remaining objections.

We acknowledge that the objectors presented a laundry list of objections to the final report, which we have not addressed here. However, the remaining objections were also not specifically addressed by the district court. There is no indication what issues the district court considered or ruled upon except the contention that the BankIowa should have obtained more income from the assets it was managing, and the failure to collect rent in 2000. Accordingly we conclude error has not been preserved on the remaining objections. *See Meier*, 641 N.W.2d at 537. "When a district court fails to rule on an issue properly raised by

a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error." *Id.*

### E. Punitive damages.

Punitive damages were not warranted here. We find no evidence that BankIowa's conduct constituted willful and wanton disregard for the rights or safety of another. *See* Iowa Code § 668.1(1)(a).

### F. Attorneys fees.

The objectors contend the district court erred in failing to award attorney fees, relying upon a provision in the Iowa Trust Code. *See Iowa Code §* 633A.4507 (allowing the court to award costs and expenses, including reasonable attorneys' fees to any party "as justice and equity may require"). *But see id.* § 633.198 ("There shall also be allowed and taxed as part of the costs of administration of estates as an attorney fee *for the personal representative's attorney*, such reasonable fees as my be determined by the court, for services rendered, but not in excess of the schedule of fees herein provided for personal representatives." (Emphasis added.)). Even assuming the Trust Code provision is applicable in these circumstances, the award is discretionary. Given that the objectors were only marginally successful in their myriad of claims, we find no abuse of discretion.

## IV. Conclusion.

We find no reason to disturb the district court's findings that, with the one exception, the executor was reasonable in not pursuing claims against the trustee or the agent. We acknowledge the circumstances changed when Oweetis became a resident of the nursing home and ultimately became

incompetent, but we conclude BankIowa did not mismanage the trust assets. In light of the breach found, the district court determined that BankIowa would receive no further compensation—this resolution was reasonable, and no further surcharge should be imposed upon the BankIowa. Punitive damages were not warranted here. We find no abuse of discretion in the denial of attorney fees. We therefore affirm.

**AFFIRMED.**